JOHN BRENNAN, JR., v. THE PENNSYLVANIA RAILROAD
COMPANY.

Argued June 13, 1905—Decided November 28, 1905.

It appearing in evidence that the driver of a team of horses attached
to a wagon loaded with two logs stopped his team in the dusk
of the evening upon a public highway at a point distant not less
than thirty-five feet from the nearest rail of a railroad crossing;
that he saw the flagman at the crossing come out of his shanty
with a lantern and set it down, and concluded from that fact that
a train was approaching; that from a point where he stopped
to a point twelve and one-half feet from the crossing his view of
the railroad was unobstructed; that the head-light of the loco-
motive was lighted; that while passing over that distance he
could see a train approaching for a quarter of a mile, but did not
use his powers of observation during any of that time, but drove
upon the track, and the horses were injured. *Held,* that the
driver was guilty of contributory negligence and that the owner
of the horses could not recover for the damage done to them, be-
cause of the contributory negligence of the driver.

On rule to show cause.

Before Justices DIXON, GARRETSON and SWAYZE.

For the rule, *Alan H. Strong.*

Contra, *Leslie Lupton.*

The opinion of the court was delivered by

GARRETSON, J.   The plaintiff sued to recover damages to
his team of horses, wagon and harness, caused by their being
struck by an engine of the defendant company at a highway
crossing known as the Six Roads crossing, a short distance
west of Rahway.

The jury gave a verdict against the defendant, which it by
this rule seeks to set aside.

The action occurred January 17th, 1903, at about 5:30
P. M. It was dark or twilight. The plaintiff's team was in

charge of Harry Hunt, his colored driver, who was using it to haul sixty-foot poles from a place called Hoxies across the tracks to Woodbridge.

There were two teams, both belonging to the plaintiff, one in charge of Hunt and the other in charge of James Tierney.

Each team was drawing a wagon on which were two logs sixty feet in length, the front and hind wheels being about forty-five feet apart.

Hunt's team was in front and Tierney's was following closely. Both men were familiar with the crossing and had been carting logs over it for a considerable time.

They approached the railroad on Leesville avenue, and the train from which the injury was received was westbound on the first track to be crossed.

About seventy feet from the railroad Leesville avenue runs into St. George's avenue, which crosses the railroad at right angles.

The plaintiff's drivers went from Leesville avenue into St. George's avenue, and then intended to go directly across the railroad.

Hunt, the driver of the injured team, stopped at the junction of Leesville avenue and St. George's avenue, then started on and continued until his horses were struck on the first railroad track.

From the place where Hunt stopped to the crossing, a distance of seventy feet, there was an unobstructed view of at least a quarter of a mile along the railroad towards Rahway (the direction from which the train in question came), except so far as the flagman's shanty interfered. The headlight of the engine was lighted.

The shanty adjoins the easterly side of the highway, was six feet from the nearest rail of the track and was six and a half feet in width along the road, so that it would begin to be an obstruction twelve and a half feet from the railroad track, while from a point seventy feet from the track to a point twelve and a half feet from the track, or for a distance of fifty-seven and a half feet, there was an unobstructed view for a quarter of a mile.

It appears from the testimony of Hunt that from the time he started from the place where he had stopped until his team was struck he did not look to see whether any train was approaching.

Upon his direct examination Hunt says: "The first we saw was the crossing, and I stopped right at the curve [this is at the junction of Leesville avenue and St. George's avenue], and when I stopped the flagman came out and set his light down and went back, and the fellow was behind me, he says: 'Go ahead, there is no train, for the flagman has set his light down and gone back.' I says: 'I don't know about that; we cannot always depend upon the flagman.' He says: 'Well, if there was a train coming he would have to be out there.' So I started on, and as I got *on* the track he came out and he says: 'There is a train coming,' and to come on across. Well, I went on, and the next thing I knew the light was on me of the engine, and it was 'zip' and it was all over." On cross-examination he testified as follows:

"*Q.* Where were you when you stopped your horses first; was it at the junction of the roads?

"*A.* Just—well, you cannot say about the junction of the roads; the hind part of my wagon was about at the junction; yes, the hind part; yes, right at the curve.

"*Q.* The point where you stopped, as you said, to look, was where; just as you come from Leesville avenue into St. George's avenue?

"*A.* Yes, sir.

"*Q.* Just about the junction of the two roads?

"*A.* Yes, sir.

"*Q.* While you were standing at that point I understood you saw the flagman come out and set down his lamp?

"*A.* Yes, sir.

"*Q.* And then Jim, who was behind you on the other load, he called out to you to go ahead, that there was no train coming; then you said you did not know about that?

"*A.* Yes, sir.

"*Q.* Then you went on, did you?

"*A.* I did; I went on."

He then describes the position of himself with reference to the flagman's shanty, saying: "As you come on here, when you got to the shanty on the wagon you were right by the shanty and there is the track."

"Q. That is when you were sitting on the wagon opposite the shanty the horses are on the track?

"A. Yes, sir; and the driver is by the shanty; when I reached the shanty he came out and said: 'Go ahead; a train is coming,' or he said, 'Come on,' or something of that kind, or 'Go ahead; a train is coming.'

"Q. That is just when you were sitting on your wagon, just opposite the watchman's shanty?

"A. Yes, sir.

"Q. Then he came out and said to you: 'Go ahead; there is a train coming?'

"A. Yes, sir; and the horse's head was then about on the first track.

"Q. When he said that to you, was your wagon standing or was it moving?

"A. We were going along.

"Q. From the time that you stopped up here at the junction of the two roads, you went right on, did you?

"A. Yes, sir.

"Q. Where was the train when you first saw it coming?

"A. Well, I could not tell you; all I seen was the light, and the light was on me then."

When the plaintiff rested, counsel for the defendant moved for a nonsuit on the ground of the contributory negligence of the plaintiff's driver in passing over the distance from where he stopped to the track, where there was an uninterrupted view from the stopping place until interrupted by the flagman's shanty. The trial justice then requested Hunt, the driver, to say how far away from the track the place was where he first stopped, and Hunt then testified it was about thirty or thirty-five feet from the nearest track.

Upon these facts we think the contributory negligence of the plaintiff's servant is clear. *Van Riper* v. *New York, Susquehanna and Western Railroad Co.,* 42 *Vroom* 345; *Beeg*

v. *New York, Susquehanna and Western Railroad Co.,* 41 *Id.* 56; *Conklin* v. *Erie Railroad Co.,* 34 *Id.* 338; *Hoops* v. *West Jersey and Seashore Railroad Co.,* 36 *Id.* 89; *Dolty* v. *Atlantic City Railroad Co.,* 35 *Id.* 710; *Winter* v. *New York and Long Branch Railroad Co.,* 37 *Id.* 677; *Pennsylvania Railroad Co.* v. *Leary,* 27 *Id.* 705; *Delaware, Lackawanna and Western Railroad Co.* v. *Heffernan,* 28 *Id.* 149; *Pennsylvania Railroad Co.* v. *Righter,* 13 *Id.* 180.

Nor are we able to perceive how the plaintiff is relieved from the effects of the contributory negligence of his driver by the action of the flagman. The first act of the flagman was to come out of the shanty, put his light outside and go into the shanty again. This could only indicate that the flagman was preparing to give a signal to an approaching train. It was not a signal for travelers on the highway, else he would have remained outside with his light at all times for the benefit of those likely to come along at any time, while if it were for the trains, it would only be used at times when a train was due or was seen approaching by the flagman, and the testimony is that the driver understood a white light means there is a train coming.

It was testified that the flagman made use of certain words and that these words were an invitation to the driver to cross. These words are variously testified to as "Get across; there is a train coming," or "There is a train coming and to come across," or "Go ahead; a train is coming," or "Come on."

These words were used when the driver of the injured team was opposite the shanty and the horses were on the track, as appears by the testimony already referred to, and Tierney, the other driver, testifies that the flagman came out with a light and put it outside, but did not say anything, and he did not come out until Harry struck the crossing with the team, and then said: "Get across; there is a train coming." These words, used under these circumstances, cannot be regarded as an invitation to the driver to cross with an assurance that it was safe. It was rather a notice to the driver

that he was in danger, and to escape the danger he must get across.

But the conduct of the flagman, although amounting to an invitation, can never relieve the traveler from the obligations to look out for his own safety. *Swanson* v. *Central Railroad Co.*, 34 *Vroom* 605; *Pennsylvania Railroad Co.* v. *Pfuelb*, 31 *Id.* 278.

The rule to show cause is made absolute.